**David GOLDENBERG a/k/a Dudu Topaz, Plaintiff,**

v.

**Jack "DOE," etc., Defendant.**

**No. CV–85–4293.**

United States District Court,
E.D. New York.

Feb. 2, 1990.

---

3. Derek Sabourin was born April 7, 1972 and thus will reach the age of majority (18) in April of 1990.

Mark M. Basichas, New York City, for plaintiff.

Ivan Van Leer, New York City, for defendant.

SIFTON, District Judge.

This is an action brought pursuant to the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, seeking to recover damages for infringement of plaintiff's copyright to an audiovisual recording (a videotape) of plaintiff's performance of a comedy routine called *"Plitot Peh"* or, in English, a "Slip of the Tongue."[1]

The case was tried before the undersigned, sitting without a jury, in May 1989. Since the date of the post trial submissions in June, the undersigned has been engaged in the trials of criminal cases, as mandated by the Speedy Trial Act. With that explanation for the delay, the Court's decision is that plaintiff is not entitled to recover damages from defendant for defendant's conceded infringement of plaintiff's copyright.

Plaintiff is not entitled to statutory damages because he registered his copyright more than three months after first use and after the violation occurred. There were no profits to defendant from sales and rentals of the infringing videotape at defendant's video rental store. Finally, the preponderance of the evidence does not establish that plaintiff's claimed actual damages came about as a result of the infringing rentals. What follows sets forth the findings of fact and conclusions of law on which these determinations are based as required by Rule 52(a) of the Federal Rules of Civil Procedure.

The videotape of plaintiff's performance was made in Israel in March and April 1985, pursuant to a January 10, 1985 agreement between plaintiff and one Amram Hadida, the owner of a recording studio, Chen Studios. The agreement provided that Hadida would be responsible for renting the studio, recording, filming, and editing the videotape, preparing the cassette cover, and advertising the tape's availability while plaintiff would be responsible for hiring the technical crew and would supply his own services without charge. Plaintiff was to receive the equivalent of $3 for each cassette sold and Hadida was to keep the balance. Hadida was to have exclusive distribution rights for the cassette in Israel

---

1. Plaintiff is a comedian who practices his art in Hebrew under the name Dudu Topaz. He is a citizen of Israel, bilingual, and known in this continent to Hebrew-speaking audiences. The title of the videotape refers to an incident of the type not unfamiliar to New York City residents that arose when Mr. Goldenberg undertook to speak in the context of a political campaign in Israel, created by his remarks a political furor, and then sought to deal with the political ramifications of his comments by attributing his remarks to "a slip of the tongue."

with an option to obtain distribution rights for the rest of the world including the United States in return for a lump-sum payment of $50,000.

After completion of the tape in April 1985, it was widely distributed in Israel.[2] The tape was successful. According to plaintiff, some 4,000 copies were sold at a retail price equivalent of $25. Of this, Hadida earned $19 per tape as the wholesale price and, after remitting some $12,000 (or $3 a tape) to plaintiff, made, according to Hadida's deposition, some $80,000 profit on the venture, after expenses. Plaintiff, in addition, cleared some $700,000 from over 300 live performances of the show which, he testified, was seen by over 250,000 persons in Israel. After release of the videotape in Israel, according to plaintiff, he experienced some decline in attendance at his live performances. The dimensions of this decline and the reasons for it (i.e., whether because of the availability of the tape or the unavailability of new customers for the live performance) is like much else in this litigation a matter of speculation since no attendance records for the performances were offered at trial.[3] Nor was any testimony offered from prospective customers either in Israel or in this country as a basis for determining the relationship between the availability of a videotape and attendance at a live performance.

Plaintiff alleges without contradiction that he secured a valid copyright in the videotape in Israel shortly after its creation and first use in April 1985. The tape contained an audio and visual warning that it was not to be copied, rented, or shown in public. The tape did not carry the international copyright symbol, nor was it registered in this country until after this lawsuit was commenced, effective February 1986.

In July 1985, plaintiff toured the United States, performing on July 10 in Los Angeles before what he described (without documentation) as a full house of 1,300 persons. Almost immediately, plaintiff says, he learned from "my people" in New York (not otherwise identified or testifying at the trial) that others had said to them "yes, we know it's an excellent show, but we've seen it on video cassette distributed by International Video Exchange. You can get the cassette for $65 or rent it out for an evening for one or two dollars." I do not, for reasons which will appear, credit this testimony, nor much else to which plaintiff testified, that is not corroborated by other evidence.

According to plaintiff, his "full house" in Los Angeles was not duplicated in New York, where only 600 tickets were sold out of a seating capacity at Town Hall of 1,800. The only record of support for all this consists of a single xerox of a Town Hall office memorandum appearing to reflect the sale of some 238 tickets on July 20, 1985. (In calculating his anticipated profits from the Town Hall performance, plaintiff elsewhere uses a figure of 2,300 for the capacity of Town Hall. After describing the ticket price as $25—in fact, the record from Town Hall shows the ticket prices at $18 and $15—and multiplying that times the capacity of 2,300, plaintiff claims that he anticipated a gross of $50,000 before deducting $15,000 of expenses.)

In fact, the credible evidence at trial establishes that defendant did not gain possession of the infringing copies of plaintiff's tape until August 1985. According to defendant's testimony, on August 14, 1985, a salesman entered his video rental and sales store on Kings Highway in Brooklyn and offered to sell him four infringing copies of plaintiff's tape.[4] After taking one

2. The videotape was made on the so-called PAL system, so as to be capable of being read or played on television sets that display visual images in 625 horizontal lines, rather than 520 lines (the NTSC system). The greater number of lines gives greater definition to images and is part of the technology generally available on television sets in Europe and Israel but not, at present, generally available in the United States.

PAL tapes cannot be played on television sets geared for NTSC tapes.

3. As plaintiff says: "I did a year of performances of almost 300 shows. Israel is a country of very small population...."

4. According to defendant, approximately 800 individuals had paid the one-time $1 registration

and playing it at home, the next day defendant purchased the four tapes for $35 apiece. Defendant then entered the tape into his computerized business records, giving each copy a catalog number and recording the date acquired as "8/18/85." These records, which were produced at trial, reflect the rental of the three tapes some forty-three times over a period from August through October at a gross revenue of $1 per rental.[5] Interestingly, one customer card is contained in the records produced by defendant reflecting a rental to a Shimon Cohen on October 20, 1985, a date when plaintiff was appearing live in Montreal and six days before his appearance at Hunter College in Manhattan. It illustrates the speculative nature of plaintiff's claim to wonder whether Mr. Cohen knew or would have cared that for a few dollars and a subway ride he could have seen plaintiff's performance live. It is, in all events, plausible to say that a large part of defendant's 60 or 70 Hebrew-speaking customers saw the tape. It would not be plausible, however, to find that each or any of those customers would have otherwise gone to Town Hall or Hunter College to see plaintiff when he performed or that plaintiff lost the $75,000 he says he had been promised in July 1985 for the American rights as a result of defendant's rental of the infringing tape.[6]

Of significance to plaintiff's damages claims, in all events, is the fact that Hadida *did* exercise his option to acquire the distribution rights to the videotape outside Israel sometime in July 1985 and gave plaintiff $3,000 in partial payment.[7] Hadida testified that he later changed his mind about the wisdom of distributing the tape in the United States because of defendant's infringement of plaintiff's copyright. Plaintiff testified that he went along with this change of heart and repaid the $3,000 to Hadida. However, it is not at all clear why defendant should be responsible for this act of generosity on plaintiff's part. Nothing in the agreement between plaintiff and Hadida insured Hadida against all risks of infringement or entitled him to recover his down payment in an event such as occurred here. Nor is it clear why defendant should be liable to plaintiff for Hadida's failure to pay plaintiff the full $75,000 said to have been due on exercise of the option, given the implausibility of the factual proposition that defendant's *de minimis* infringement was the cause of Hadida's change of heart about developing the U.S. market.

In October 1985, plaintiff made a second tour of North America, appearing in Los Angeles, Miami, Toronto, Boston, and New York. Again plaintiff asserts (without documentary support) that he played to full houses everywhere except New York. At Hunter College out of an asserted capacity of 2,300, only 500 seats are said to have been filled, again without documentary support. Plaintiff sent a friend to defendant's store, where on November 5, 1985,

fee as customers of the store during 1985. Of these 800, between 60 and 70 were, according to defendant, conversant in Hebrew.

5. Records were produced for only three of the four tapes. The fourth tape was sold in October for $65 to a friend of plaintiff acting in an undercover capacity. Defendant testified that he made $9 on the rental of that tape before its sale.

6. Plaintiff testified that the option price was orally increased to $75,000. No record exists of this modification of the option in what is described simply as "July 1985" (before or after plaintiff says he learned that defendant was distributing his tape?) While Hadida testified that he made a $3,000 downpayment on the option, he testified that the payment was made "by cash." Nor is there any record of the asserted repayment of this money or evidence as to its

date. The failure to be forthcoming with evidence of this sort weighs against plaintiff in his effort to persuade the undersigned that the repayment and decision not to develop the U.S. market (a decision later reversed) was caused by defendant's rental of plaintiff's tapes, rather than tied to other considerations such as plaintiff's dismal ticket sales in the New York area both before and after defendant acquired the tape.

7. Precisely what Hadida acquired by exercise of this option is not all that clear. The English translation of the January 1985 agreement simply says that the option was for the distribution rights to the video cassette previously produced for sale in Israel, i.e., the videocassette recorded for the PAL system and not viewable on U.S. television sets. Presumably, the parties contemplated making a new recording, capable of being played on the NTSC system.

she purchased for $65 one of the four videotapes that defendant had been renting. In November plaintiff confronted defendant, and defendant ceased renting the videotape. On November 26, 1985, this litigation was commenced. Since the lawsuit was started, plaintiff and Hadida have in fact developed together a NTSC tape of plaintiff's performance for sale in the American market. Five hundred copies of this tape have been sold to American tourists in Israel and Hebrew speakers in the United States under an arrangement pursuant to which plaintiff receives $3 for each tape sold. Plaintiff seeks to recover as actual damages the $75,000 for the loss of ticket sales at Town Hall in July and Hunter College in October, plus the full $75,000 price which Hadida declined to pay for the exercise of the option—all of which plaintiff attributes to defendant's videotape rentals.

### DISCUSSION

Infringement of plaintiff's copyright by defendant's forty-three rentals is not disputed. What plaintiff has failed to prove is his entitlement to damages for this infringement pursuant to 17 U.S.C. § 504.

Subsection 504(a) provides:

"*In General.* Except as otherwise provided by this title, an infringer of copyright is liable for either—

    (1) the copyright owner's actual damages and any additional profits of the infringer, as provided in subsection (b); or

    (2) statutory damages, as provided by subsection (c)."

Although statutory damages may be elected by a copyright owner, no such election has been made here, undoubtedly because 17 U.S.C. § 412(2) bars recovery of statutory damages where the infringement occurred before the effective date of plaintiff's registration of the copyright and more than three months after the work's first publication.

Plaintiff has instead elected to pursue a claim for actual damages. (No profits are due since the gross revenue estab-lished by plaintiff to have been derived from the infringement amounts to no more than $117 [$52 rental revenue plus a $65 sale to plaintiff's representative] and defendant has established that he had expenses of $140 in acquiring the infringing tapes.) Plaintiff has, however, failed to establish by a preponderance of the credible evidence that he in fact sustained actual damages which were proximately caused by defendant's infringement in the only two categories in which he seeks to recover: (1) $75,000 in lost ticket sales in New York City in July and October 1985, and (2) loss of $75,000 which Hadida allegedly refused to pay plaintiff for Hadida's exercise of an option to distribute the videotape outside Israel.

With regard to the first category of damages, it is clear that plaintiff's failure to fill Town Hall in July had nothing to do with defendant since defendant did not acquire the infringing tape until a month after plaintiff's appearance. Nor am I convinced that the poor turnout for plaintiff's Hunter College performance in October can be attributed to defendant's activities in the ensuing months. Other explanations are available, even assuming (despite the absence of documentary evidence and plaintiff's demonstrated tendency to exaggerate) that plaintiff's performance in each of the other cities in the United States and Canada in which he appeared was a sellout. Plaintiff has, by his own admission, become something of a political figure in Israel. New York is not untouched by political disputes within Israel. New York is also a premier city for live entertainment, and arguably the competition was simply too tough. No potential customer for the live performance testified. Nor did any patron of the Kings Highway videostore. While it is conceivable that some stayed away who otherwise might have enjoyed the show because they had rented or expected to rent the tape from defendant, both that fact and the number of such customers remain on this record totally speculative. Plaintiff is not entitled to recover damages on such a tenuous basis. *Business Trends Analysts, Inc. v. The Freedonia Group, Inc.*, 887 F.2d 399 (2d Cir.1989).

Nor is plaintiff entitled to recover damages from defendant for Hadida's failure to honor his commitment to pay $75,000 for the right to distribute the videotape outside Israel. Even assuming that "the videotape" which was the subject of the option agreement was a remake of the original PAL system tape using the NTSC system so as to permit its viewing on U.S. television sets, it is simply not credible that Hadida decided not to pay plaintiff for the option or that plaintiff decided not to pursue his remedies against Hadida because of defendant's rental of the infringing tape in August through October. Again, other explanations suggest themselves including the poor reception for plaintiff's live performances in the New York City metropolitan area, which plaintiff himself characterizes as the most important U.S. market for a videotape in Hebrew, both before and after defendant began renting the infringing tape.

More importantly, however, I simply do not credit plaintiff's case. Plaintiff, it should be noted, did not seek to mitigate his damages by pursuing his legal remedies against Hadida for reneging on his exercise of the option, despite the absence of any warranty by plaintiff against infringement. Instead, he repaid Hadida the $3,000 already paid and entered into a new arrangement for development of the U.S. market pursuant to which plaintiff receives $3 for each tape sold by Hadida—the same arrangement pursuant to which plaintiff and Hadida operate in Israel. In a response to defendant's interrogatories, plaintiff notes that Hadida's wholly owned business, Chen Studio, either owns or has owned all along a one-half interest in the copyrighted material. Thus, it may well be that this lawsuit represents nothing more than an effort by joint copyright owners to establish a means to recover for the loss of their hoped-for joint profits from sales in the U.S. market. In all events, however characterized, it is clear that plaintiff's failure to make more money than he has out of *Plitot Peh* in the American market cannot on this record be laid at the door of defendant.

The Clerk is directed to enter judgment in favor of defendant dismissing the complaint and to mail a copy of the within to all parties. No costs to either side. 17 U.S.C. § 505.

SO ORDERED.