Douglas M. BRUCE

v.

WEEKLY WORLD NEWS, INC.

No. CIV. A. 98–11044–RGS.

United States District Court,
D. Massachusetts.

July 13, 2001.

Andrew D. Epstein, Barker, Epstein & Loscocco, Boston, MA, for Plaintiff.

Andrew Baum, Darby & Darby, New York City, David S. Rosenthal, Hutchins, Wheeler & Dittmar, Boston, MA, Lisa M. Pollard, Any Baum, Darby & Darby, New York City, for Defendant.

## FINDINGS OF FACT, RULINGS OF LAW AND ORDER FOR JUDGMENT FOLLOWING A TRIAL WITHOUT JURY

STEARNS, District Judge.

In March of 1992, Douglas Bruce, a freelance photographer, took a photograph of Bill Clinton shaking hands with a by-stander. The photo was shopped to the defendant Weekly World News (WWN),[1] a New York based entertainment tabloid. WWN published the photo repeatedly without Bruce's permission.[2] In 1998, Bruce filed this lawsuit. A three day trial on damages concluded on February 2,

---

1. On July 22, 2000, WWN, as a result of a merger, changed its name to America Media Consumer Entertainment, Inc., which was substituted by motion as the named defendant. To avoid confusion, I will refer to the defendant by its more recognizable name, WWN.

2. WWN does not contest this point. The focus of the case is therefore on damages.

2001. On April 17, 2001, the parties completed the filing of post-trial pleadings.

### FINDINGS OF FACT

Based on the credible testimony and the exhibits offered at trial, I find the following material facts.

1. In March of 1992, Douglas Bruce, a freelance professional photographer, snapped a picture of presidential candidate Bill Clinton in a characteristically affable pose, gripping the hand of an unidentified Secret Service agent. Bruce consigned the photo to the Picture Group, a now defunct Rhode Island photo stock agency. In June of 1992, Susan Chappell, a photo editor at WWN, telephoned Jonathan Yonan, a Picture Group researcher, seeking a photo of Clinton shaking hands. Yonan supplied Chappel with Bruce's photo among others. Chappell told Yonan that she liked the photo and that WWN wanted to manipulate it by cropping the background and superimposing the image of the Space Alien [3] to give the appearance of a tête-à-tête with Clinton. After Bruce agreed to the alteration of the photo, Yonan called Chappell to discuss a licensing fee. To Yonan's surprise, Chappell told him that WWN had already retouched the photo. When Yonan and Chappell were unable to agree on a fee, Chappell asked about a buyout. Yonan, unable to reach Bruce, consulted with his superior at the Picture Group, and then quoted Chappell a price of $3,000. Chappell balked and no agreement was reached.

2. A week or two later, Yonan was "shocked" to see the retouched photo on the front page of the August 11, 1992 edition of WWN, paired with the headline "Alien Backs Clinton!" Yonan immediately sent a bill for $500 to WWN, which WWN paid.[4] By contract, half of the fee was shared with Bruce. Until the Picture Group ceased doing business in 1993, Yonan sent a bill each time he saw the retouched photo in WWN. Bruce received a total of $1,775 in fees as a result.

3. In 1994, while browsing through a current issue of WWN, Bruce saw an advertisement for a t-shirt reproducing the "Alien Backs Clinton" cover. Bruce consulted a New York attorney who sent WWN a cease and desist letter. WWN responded with an offer to pay $500 for a general release, which was not accepted. The matter remained dormant until 1998, when Bruce retained his present attorney.

4. Since June 1, 1995,[5] WWN has made four editorial uses of the "Alien Backs Clinton" photo. In the May 28, 1996 issue, the photo appeared twice in spot insets

---

**3.** The Space Alien is an extraterrestrial visitor with an avid, if unorthodox, interest in American politics. His exploits have been chronicled for over ten years in the pages of WWN. The Alien first came to WWN's attention in October of 1990 when he was captured by FBI paranormal agents. WWN carried an exclusive account of the Alien's escape a month later. Over the next year, the Alien (to the dismay of an apparently oblivious Secret Service) posed with President George Bush and Reform Party presidential candidate Ross Perot. He then shocked the political world by endorsing Bill Clinton in the 1992 presidential race. Although the Alien facilitated First Lady Hillary Clinton's adoption of an Alien Baby in 1993, in 1994 he became disaffected with the Clintons. After conferring with Rush Limbaugh and Newt Gingrich, he backed Senator Robert Dole in the 1996 presidential contest. The Alien has since remained dependably Republican. He endorsed George W. Bush's presidential bid in early 2000.

**4.** Although WWN's check was dated August 5, 1992, WWN, consistent with the practice of many time-sensitive periodicals, regularly post-dates issues.

**5.** Because this lawsuit was filed on June 1, 1998, Bruce concedes that he is only entitled to damages accruing after June 1, 1995. *See* 17 U.S.C. § 507(b).

accompanying an article entitled "Alien Endorses Dole for President." In the first of the insets, President Clinton is shown holding a copy of the cover of the August 11, 1992 issue of WWN. This photo ("Clinton Holding Cover"), taken by an unknown photographer, was purchased by WWN from Corbis Image. In the second inset, the original photo appears in an ensemble of WWN covers featuring the Alien. The "Clinton Holding Cover" photo appeared twice in the May 9, 2000 edition of WWN. A 1½" × 3" version is inserted in a front page picture showing the Alien shaking hands with George W. Bush. A slightly larger version appears next to the related inside "news" story. WWN also published a 3" × 7" version of the "Clinton Holding Cover" photo forty-eight times as an illustration in an internal subscription ad.

5. WWN used the photo to create an "Alien Backs Clinton" t-shirt featuring a full-sized reproduction of the August 11, 1992 cover of WWN. The photo also appears as a 1½" × 2" inset on a t-shirt reproducing the cover of the June 7, 1994 issue of WWN ("12 U.S. Senators Are Space Aliens!") on which the twelve real-life Senators are pictured. Ads promoting the sale of these two t-shirts among others appeared 188 times in WWN during the infringement period. WWN ordered 5,710 and sold 1,817 of the "Alien Backs Clinton" t-shirts. WWN also ordered 4,767 and sold 2,207 of the "Senators Are Aliens" t-shirts. From September of 1997 through January 1999, the "Alien Backs Clinton" t-shirts were shown along with other merchandise on WWN's Internet site.

6. The Alien is a staple character that has appeared regularly on the cover of WWN, usually in the company of a prominent political figure. The Alien image was realized in 1990 by a WWN staff photographer.

## RULINGS OF LAW

■■■ A prevailing plaintiff in a copyright action is entitled to recover his actual damages, calculated as a measure of the profits lost as a result of the infringement. *Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1170 (1st Cir.1994). A plaintiff must prove these damages with some exactitude, although the proof need not approach mathematical certainty. *Stevens Linen Assocs., Inc. v. Mastercraft Corp.*, 656 F.2d 11, 14 (2d Cir.1981). In addition to actual damages, a plaintiff may also force the infringer to disgorge any nonduplicative profits earned as a result of the copyright violation, that is, "any profits ... attributable to the infringement [that] are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). "In the context of infringer's profits, the plaintiff must meet only a minimal burden of proof in order to trigger a rebuttable presumption that the defendant's revenues are entirely attributable to the infringement; the burden then shifts to the defendant to demonstrate what portion of its revenues represent profits, and what portion of its profits are not traceable to the infringement." *Data General*, 36 F.3d at 1173.

## DISCUSSION

*Profits Damages*

I will address the "profits damages" issue first, as it is the more difficult. Bruce seeks to recover profits earned by WWN during the infringement period from: (1) sales of the "Alien Backs Clinton" and "Senators Are Aliens" t-shirts; (2) sales of display advertising; and (3) newsstand and subscription sales. As for the t-shirt sales, WWN concedes the right, if not the amount, of Bruce's recovery. During the infringement period, 1,817 units of the "Alien Backs Clinton" t-shirt and 2,207 units of the "Senators Are Aliens" t-shirt

were sold at $12.95 each, plus a $3.00 surcharge for postage and handling.[6] According to Exhibit 19, the average cost of the t-shirts to WWN was roughly $4.25 per unit, yielding a net profit on the Clinton t-shirt of $15,807.90, and on the Senators t-shirt of $19,200.90, for a total of $35,008.80.[7]

Bruce insists that he is entitled to the entire $35,000.[8] Section 504(b) of the Copyright Act, however, permits a defendant to show that some or all of the profits earned from the infringement are "attributable to factors other than the copyrighted work."

> The defendant's burden under the apportionment provision of Section 504(b) is primarily to demonstrate the absence of a causal link between the infringement and all or part of the profits claimed by the plaintiff. See *Walker, [v. Forbes, Inc.]* 28 F.3d at 412 (describing Section 504(b) as "a rule of causation"). Because the rebuttable presumption of causation represents a presumption as to both cause-in-fact and proximate cause, there are two avenues of attack available to a copyright defendant. First, the defendant can attempt to show that consumers would have purchased its product even without the infringing element. *See, e.g.; id.* at 413

(holding that district court properly allowed the defendant to show that an unauthorized reproduction of a photograph in an issue of its magazine had no causal relation to "amounts of revenue ... committed to the issue sight unseen"). Alternatively, the defendant may show that the existence and amount of its profits are not the natural and probable consequences of the infringement alone, but are also the result of other factors which either add intrinsic value to the product or have independent promotional value. See, e.g., *Sheldon v. Metro–Goldwyn Pictures Corp.,* 309 U.S. 390, 407–08, 60 S.Ct. 681, 84 L.Ed. 825 (1940) (approving apportionment where profits of defendant's film were largely attributable not to the plaintiff's pirated story but rather to the "drawing power" of the star performers and the artistry of others involved in the creation of the film); *Abend v. MCA, Inc.,* 863 F.2d 1465, 1480 (9th Cir.1988) (remanding for apportionment where factors other than the underlying story—particularly the talent and popularity of Alfred Hitchcock, Jimmy Stewart, and Grace Kelly—"clearly contributed" to the success of the film "Rear Window"), *aff'd on other grounds,* 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 ... (1990); *Sygma Photo News, Inc. v. High*

---

**6.** The $3.00 surcharge seems a fair approximation of the costs of handling and mailing the t-shirts based on the evidence at trial.

**7.** I agree with WWN that payment should be made on the t-shirts actually sold and not on the total number of t-shirts that were ordered. Bruce argues that the unsold t-shirts have promotional value (WWN could give them away, for example, in the expectation that they would be worn by human billboards). While good will and market recognition may be treated as "profits" under the Copyright Act, there must be some factual basis for the calculation. *Business Trends Analysts, Inc. v. The Freedonia Group, Inc.,* 887 F.2d 399, 404 (2d Cir.1989). Here there is no evidence that

WWN distributed or made any other promotional use of the unsold t-shirts. Bruce, is, however, entitled to injunctive relief barring any further sale of the infringing t-shirts without his permission.

**8.** I agree in principle with Bruce's argument that a copyright owner is competent to express an opinion as to the value of his copyrighted work, and I admitted Bruce's estimates of his damages for that reason. However, the sum total of optimal damages claimed by Bruce, $416,617.90, is so far beyond the rim of the remotely credible as to compel a steep discount of his testimony.

*Soc'y Magazine, Inc.*, 778 F.2d 89, 96 (2d Cir.1985) (apportioning profits from sales of "Celebrity Skin" magazine where promotional cover contained not only infringing photograph of Raquel Welch but also a list of other nude celebrity photographs contained within) . . . .

*Data General*, 36 F.3d at 1175.

 WWN chose the second route by offering evidence (through Susan Chappell) of the conception and development of the Alien character, its resonance with WWN's readership, and its role in a running spoof of American politics. WWN makes the point, and it is a valid one, that no market existed among its readers for a generic photograph of President Clinton shaking hands. Rather its readers were attracted by the oddity of a photograph of President Clinton fraternizing with an alien being. The Alien's "star" power, like that of the performers in *Sheldon, supra* (where the copyright owner was apportioned one-fifth of the profits), or the entourage of lightly dressed women in *Sygma Photo, supra* (where the apportionment was one-half) clearly added cachet to Bruce's photo.[9] Under the circumstances, a fair award should recognize that the composite value of the photo is derived from the collaboration of its two "stars," the one facilitated by Bruce, and the other by WWN. This can be achieved by apportioning the Clinton t-shirt profits equally between the two authors, resulting in an award to Bruce of $7,903.95. Applying the same formula to the Senators t-

shirt, on which Bruce's photo is one of thirteen represented, a fair apportionment results in an award to Bruce of one-half of one-thirteenth of the profits, or $738.50.[10]

Bruce's estimate of WWN's advertising revenues during the infringement period teeters on speculation. According to Bruce, he took three "representative" issues of WWN, and to the "best of his ability," valued the ads in each issue according to WWN's published rates. Using this method, Bruce estimated an average advertising gross for the three issues of roughly $33,000. He then multiplied the $33,000 figure by the 259 issues of WWN that were sold during the infringing period. Bruce argues that he is entitled to recover a sum based on 75% of the total advertising gross, as the photo, in one form or another, appeared in 195 or 75.3% of the 259 issues. Bruce's formula is as follows.

> If this court were to take 75% of the average gross revenues obtained from advertising, namely $32,721, the result would be $24,541 per issue. Since Plaintiff's photograph appeared on at least one of each of the 48 pages that comprise a regular edition of Weekly World News . . ., the Plaintiff is entitled to one forty-eighth ($\frac{1}{48}$) of all revenue received or $511 per issue ($24,541 ÷ 48). Since the Plaintiff's photograph gained icon status in Weekly World News, the plaintiff should recover $511 for all 259 issues that were published during the period

---

**9.** It does not seem to have occurred to WWN to obtain President Clinton's permission to make commercial use of his likeness. *See* M.G.L. c. 214, § 3A.

**10.** Bruce also contends that he is entitled to a royalty of $2.50 on each of the Clinton t-shirts and $1.00 on each of the Senators t-shirts. This I reject for two reasons. First, a royalty is obviously duplicative of the award of profits

damages, and therefore barred by § 504(b). Second, I credit the testimony of Darryl Jacobson, defendant's expert witness, that continuing royalties on promotional items are contrary to industry practice. Tr. 2:108–109. Sherri Blaney, plaintiff's expert witness, also testified that continuing royalty payments on promotional items were inconsistent with her experience. Tr. 2:56.

whether or not his picture was used, or $132,349 ($511 × 259 issues).

Plaintiff's Closing Memorandum, at 16.

Bruce's figures as to WWN's earnings from newsstand and subscription sales are based on WWN's Publisher's Statement of Sales. Bruce multiplied the totals of the sales reported during the infringing period by the relevant cover and subscription prices to arrive at gross circulation revenues of $2,765,461, from which amount, using the same formula that he applied to advertising revenue, Bruce calculates he is owed $43,210.

 Even if Bruce's estimates are acceptable approximations, the claim for profits from advertising revenues and subscription sales founders on the lack of any showing of a causal relationship between the alleged profits and the misappropriation of the photo.

> In establishing the infringer's gain, the assessment in every case must be guided by the rule that the statute awards the plaintiff only the "profits of the infringer *that are attributable to the infringement.*" 17 U.S.C. § 504(b) (emphasis supplied). This is a rule of causation, and
>
>> it is necessary to attribute profits directly to the infringement, which in turn requires that the damages be direct rather than remote, and that an appropriate apportionment be made between revenue attributable to infringement and other revenue....
>
> 3 Melville B. Minner & David Minner, *Minner on Copyright* § 14.03 (1993) (footnotes omitted).

*Walker v. Forbes, Inc.,* 28 F.3d 409, 412 (4th Cir.1994).

As noted in *Forbes,* advertising in periodicals is placed in advance and is not based on the content of any single forthcoming issue, which, with an occasional exception like the Sports Illustrated swimsuit edition, is unknown to the advertiser. *Forbes,* 28 F.3d at 412. In the same vein, it is "factually impossible, because of the lead times built into [a] subscription system, to see a copy of [a] magazine on the stand, subscribe immediately as a favorable reaction and then receive that issue as part of the subscription." *Id.* The argument could be made that but for the "Alien Backs Clinton" photo, WWN would not have sold the number of issues that it did, and that the enhanced sales garnered the advertisers and the resulting revenues. Bruce, in fact, does offer a variant of this argument, contending that "[t]he repetitive use of the ["Alien Backs Clinton"] photograph indicates that the derivative work based on Plaintiff's copyright became so important to Defendant that the use of Plaintiff's copyright was wrapped up in Defendant's identity, marketing, and advertising." Plaintiff's Closing Memorandum, at 20–21. The suggestion that the "Alien Backs Clinton" photo (as opposed to the Alien character) acquired totemic significance as an alter-ego for WWN is not, however, borne out by the evidence. While WWN published the photo often (usually as a picture within a picture), it did so in comparatively microscopic doses, and as only one of many photos featuring the Alien in the company of various political figures.[11]

Newsstand sales, on the other hand, might stand in a different light. A "profits damages" case could be made with respect to an infringement involving the publication of a singularly sensational cover pho-

---

11. WWN promoted "Bat Boy," its other continuing character, as assiduously as it did the Alien.

tograph. Publishing industry experience teaches that an evocative cover stimulates sales. Here, of course, there were no cover uses of the "Alien Backs Clinton" photo during the infringement period unless one counts the photo within a photo ("Clinton Holding Cover") that appeared as an inset on the front page of the May 9, 2000 edition. Even if one does, according to the plaintiff's own evidence, the photo did nothing to stimulate WWN's sales, as the May 9 issue scored in the bottom half in newsstand sales during the January to May 2000 run.

Bruce ultimately relies on the literal wording of the Copyright Act that "the copyright owner is required to present proof only of the infringer's gross revenue," thereby shifting to the infringer the burden of proving its "deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). This burden, Bruce contends, WWN has failed to meet by refusing to disclose or offer in evidence proof of its actual operating costs and profits. This argument was considered and rejected in, among other cases, *On Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001), on facts similar to those here.

Davis submitted evidence that, during and shortly after the Gap's advertising campaign featuring the "fast" ad, the corporate parent of the Gap stores realized net sales of $1.668 billion, an increase of $146 million over the revenues earned in the same period of the preceding year. The district court considered this evidence inadequate to sustain a judgment in the plaintiff's favor because the overall revenues of the Gap, Inc. had no reasonable relationship to the act of alleged infringement. *See Davis I*, 1999 WL 199005, at *6. Because the ad infringed only with respect to Gap label stores and eyewear, we agree with the district court that it was incumbent on

Davis to submit evidence at least limited to the gross revenues of the Gap label stores, and perhaps also limited to eyewear or accessories. Had he done so, the burden would then have shifted to the defendant under the terms of § 504(b) to prove its deductible expenses and elements of profits from those revenues attributable to factors other than the copyrighted work. . . .

[W]e think the term "gross revenue" under the statute means gross revenue reasonably related to the infringement, not unrelated revenues.

Thus, if a publisher published an anthology of poetry which contained a poem covered by the plaintiff's copyright, we do not think the plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue resulting from its publication of hundreds of titles, including trade books, textbooks, cookbooks, etc. In our view, the owner's burden would require evidence of the revenues realized from the sale of the anthology containing the infringing poem. The publisher would then bear the burden of proving its costs attributable to the anthology and the extent to which its profits from the sale of the anthology were attributable to factors other than the infringing poem, including particularly the other poems contained in the volume. The point would be clearer still if the defendant publisher were part of a conglomerate corporation that also received income from agriculture, canning, shipping, and real estate development. While the burden-shifting statute undoubtedly intended to ease plaintiff's burden in proving the defendant's profits, we do not believe it would shift the burden so far as to permit a plaintiff in such a case to satisfy his burden by showing gross revenues from agriculture, canning, shipping and real

estate where the infringement consisted of the unauthorized publication of a poem. The facts of this case are less extreme; nonetheless, the point remains the same: the statutory term "infringer's gross revenue" should not be construed so broadly as to include revenue from lines of business that were unrelated to the act of infringement. *Id.*, 246 F.3d at 159–160.

### Actual Damages

Bruce identifies his categories of actual damages as follows: (1) four unauthorized editorial uses of the "Alien Backs Clinton" photo; (2) repeated use of the photo on the two infringing t-shirts; (3) 188 unauthorized uses in advertisements for the sale of the t-shirts; (4) forty-eight uses in WWN's subscription advertisements; and (5) sixteen months of unauthorized home page and inside use of the photo on WWN's internet site.

 As to the editorial use of the retouched photo in the May 28, 1996 issue of WWN, I conclude that an inflation adjusted fee of $300, based on Bruce's share of the original fee paid to the Picture Group, is a fair award. With respect to the use of the photo on the "Alien Backs Clinton" and the "Senators Are Aliens" t-shirts, I accept the congruent testimony of plaintiff's and defendant's expert witnesses, Sheri Blaney and Darryl Jacobson that a fee of $500 for the Clinton use and $300 for the Senators use is appropriate.[12] The use of the photo in advertising the sale of the t-shirts, I deem non-compensable, as the ads, by generating sales, also generated the profits damages that Bruce

has been awarded. I also credit the testimony of both expert witnesses that it is contrary to industry practice to charge a fee to advertise sales of a licensed image. Tr. 2:48; 2:109–110. The uses of the "Clinton Holding Cover" photo (as editorial content in the May 28, 1996, and May 9, 2000 issues, and in the forty-eight internal subscription ads) I also deem not compensable. I credit Darryl Jacobson's testimony that WWN, after having paid for the use of the "Alien Backs Clinton" photo on the original cover, would have been permitted by industry practice to reprint the cover in its own publication without paying an additional fee. Tr. 2: 117–118. This is particularly the case where, as here, the "Clinton Holding Cover" photo (in which the August 11, 1992, cover appears) has an independent originality that is not derivative of Bruce's work. I conclude that an award of $1,200 (or $75 a month), a sum more or less consistent with the expert testimony at trial, is appropriate for the unauthorized use of the photo on WWN's website.[13] (Both experts agreed that because the internet is a separate medium, industry practice requires a separate license for internet use). Finally, both experts agreed that a multiple would be applied to fees charged where an infringer made unlicensed use of a photo. Jacobsen pegged the multiple at three, although he conceded that in a case of outright theft, Blaney's suggestion of a multiple of ten would be appropriate. As this case lies somewhere in the middle of the spectrum between a negligent and a larcenous appropriation, I will use a multiple of five to enhance the award of actual damages.[14]

---

12. This is the fee that I determine Bruce is due over and above any agency payment.

13. Again I have not factored in any agency fee as there is no evidence that Bruce was represented by an agency in 1997 when the internet use began.

14. I distinguish the multiplier from any concept of punitive damages, as I agree with WWN that the copyright law disfavors penalties. *Sheldon*, 309 U.S. at 399, 60 S.Ct. 681. Both expert witnesses, however, agreed that it is standard industry practice to apply a multi-

## ORDER

For the foregoing reasons, judgment shall enter for plaintiff Douglas Bruce in the sum of $20,142.45. WWN is hereby *ENJOINED* from any further sale or distribution of the "Alien Backs Clinton" or "Senators Are Aliens" t-shirts without first obtaining the permission of the plaintiff. Plaintiff will have twenty-one days to file a petition for costs and a reasonable attorney's fee. *See* 17 U.S.C. § 505.

SO ORDERED.

plier to the normal licensing fee in cases where an unauthorized use is detected.