Alice **CHILDRESS**, Plaintiff,

v.

Clarice **TAYLOR**, Paul B. **Berkowsky**, the Moms Company, and Ben Caldwell, Defendants.

No. 87 Civ. 6924 (CSH).

United States District Court, S.D. New York.

July 14, 1992.

case.

Linden and Deutsch, New York City, (David Blasband, Jessica R. Friedman, of counsel), for plaintiff.

Cowan, Leibowitz & Latman, P.C., New York City (Peter Herbert, Alastair McMullan, of counsel), for defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In a Memorandum Opinion and Order dated November 27, 1990, 1990 WL 196013, this Court granted plaintiff Alice Childress summary judgment against defendants Clarice Taylor, Paul B. Berkowsky, The Moms Company and Ben Caldwell on the issue of copyright infringement. That opinion held that a stage play entitled "Moms," subtitled "The First Lady of Comedy," infringed plaintiff's copyrighted play entitled "Moms," subtitled "A Praise Play

for a Black Comedienne." Both plays were about the life of Jackie "Moms" Mabley, a stage performer who died in 1975 in Harlem at the age of 82. Defendant Taylor starred in the infringing play. Defendant The Moms Company produced it. Defendant Berkowsky was general manager of The Moms Company. Defendant Caldwell was the author of the infringing play.[1]

The parties disputed the form of judgment to be entered. I resolved those disputes in a Memorandum Opinion and Order dated February 22, 1991, 1991 WL 29194. That Opinion rejected Berkowsky's contention that he should not be included in the summary judgment in plaintiff's favor. Rejecting Berkowsky's contention, I said that there was "no basis in fact or in law to relieve defendant Paul B. Berkowsky from liability in the case or the sweep of any future judgment," concluding "that Berkowsky is liable as a contributory infringer." Slip op. at 3.

Following entry of summary judgment on liability against all defendants, they appealed on the ground that Childress and Taylor were co-authors of the copyrighted play, so that Childress had no viable claim for infringement. The Second Circuit affirmed the entry of summary judgment in plaintiff's favor. 945 F.2d 500 (2d Cir. 1991). Berkowsky did not appeal from this Court's conclusion that he was liable as a contributory infringer.

Thereafter this Court conducted a bench trial to determine the amount of plaintiff's damages. Counsel have submitted post-trial briefs and reply briefs. This Opinion constitutes the Court's findings of fact and conclusions of law under Rule 52(a), Fed. R.Civ.P. To the extent that the Court's recitations of fact in its November 27, 1990 Opinion furnish pertinent background, they are incorporated herein by reference.

### Findings of Fact

Plaintiff Alice Childress is an established African–American woman playwright, au-

---

**1.** Plaintiff's complaint asserted a claim against a fifth defendant: Bruce Mailman, the owner of a theatre at which the infringing play was produced. This Court's November 27, 1990 opinion granted Mailman's motion for summary judgment dismissing the complaint as to him. Plaintiff did not appeal.

thor and lecturer. Since 1950 she has written some 15 plays, many of which have been produced on the stage or for television, and several novels, one of which was adapted as a television movie. She has received academic and non-academic awards.

For the past 35 years plaintiff has been represented by Flora Roberts, Inc. Flora Roberts, the principal of that agency, has been a literary agent specializing in dramatic literature for 40 years. Roberts has negotiated contracts for a number of significant Broadway productions, including "West Side Story," "A Chorus Line," and "Sunday in the Park with George." Since Roberts began to represent Childress, she has negotiated all of Childress's contracts for plays and books.

Defendant Clarice Taylor is a prominent African–American actress. She and Childress first met when they were both acting in the American Negro Theatre in the 1940's.

The idea for a play based on the life of Moms Mabley originated with Taylor. Taylor's interest in Mabley borders upon an obsession. Taylor testified that she "grew up" on Moms Mabley in Harlem. In 1982 Taylor had portrayed Mabley in a skit which was included in a stage production based on the story of the Apollo Theatre in Harlem, where Mabley had appeared. Preparing for that role, Taylor listened to her collection of Moms Mabley recordings, talked to anyone who might have met her, and became familiar with Mabley's walk and demeanor.

While she was appearing in the Apollo Theatre production, Taylor communicated with her friend Childress about doing a play on the life of Moms Mabley. Childress turned her down at that time.

Taylor's interest in Mabley was sufficiently well known that in late 1985 or early 1986 the producers at the Green Plays Theatre in Lexington, New York contacted Taylor and advised they had an opening for a play in their August 1986 season. The Green Plays producers asked Taylor if she could become involved in a play about Mabley.

Taylor again approached Childress, who this time agreed to work on a script of a play about Moms Mabley. Working against a tight six-week schedule, Childress wrote her play. She filed for and received a copyright for the play in her name.

Childress's play opened at Green Plays in August 1986. Prior to that time, Childress and Taylor had not entered into any firm arrangements. They had not exchanged draft contracts, although Taylor had paid Childress $2,500 before the play was produced at the Green Plays Theatre.

After the Green Plays production had run its course, Childress was approached by Stevie Phillips, who was employed by Universal Pictures, had previously produced stage plays (including "The Greatest Little Whorehouse in Texas"), and was related to Steven Foreman, the director of the Green Plays production. Phillips expressed interest in producing Childress's play. Childress said she was interested and referred Phillips to Flora Roberts, her agent. A meeting thereafter occurred involving Phillips, Childress and Taylor. Roberts testified (Tr. 11), and I find, that at that meeting Phillips refused to agree that Taylor play the leading part of Moms Mabley. Phillips also rejected a director that Taylor preferred. Phillips said to Roberts that she wanted to option the Childress play and go ahead with it. However, Childress preferred not to pursue this possibility with Phillips and Foreman, but rather to defer to Taylor's preferences, since, as Childress explained in her testimony, she had written The Moms Mabley play for Taylor to star in and produce.

Childress, represented by her agent Roberts, and Taylor, represented by her agent Scott Yoselow and an attorney, Jay Kramer, entered into prolonged and ultimately fruitless efforts to agree on the terms of a contract. No contract had been agreed upon when, in February 1987, with both parties' consent, the Childress play was produced with Taylor playing the role of Moms Mabley at the Hudson Guild Theatre. Childress added some new material to the script, for which she also received a copyright. The Hudson Guild production

of the Childress play ran from the beginning of February through the end of the first week in March, 1987. The playbill credited Childress as the author of the play. The play and Taylor's performance received favorable reviews from critics including those writing in the New York Times and the New Yorker. Taylor was awarded an "Obie."

Following the Hudson Guild run of the play, Childress, Taylor and their representatives were interested in further commercial productions. But the inability of Childress and Taylor to come to terms with each other presented obstacles. The differences between the parties were longstanding. On May 9, 1986, even before the Green Plays production, Taylor's agent Yoselow had written to Childress's agent Roberts, suggesting an agreement that "the finished play shall be equally owned and be the property of both Clarice Taylor and Alice Childress." Childress never agreed to that concept of joint ownership. Taylor seemingly retreated from it when in March 1987, as the Hudson Guild Production was drawing to a close, Kramer as Taylor's attorney submitted to Childress and Roberts a draft agreement whose preamble stated:

> The Producer [Taylor] wishes to acquire from the Author [Childress] the rights to produce and present a dramatic play written by Author and heretofore presented at the Hudson Guild Theatre based on the life and career of Moms Mabley. . . .

Taylor's proposed contract provided for a 4% royalty to Childress as author which Roberts testified was unacceptable to Childress, as were other terms of the proposed contract. Tr. 9–10. Childress, Taylor and their representatives met at Roberts' office in March 1987 to discuss the matter, but no agreement could be reached. Taylor, who Roberts described as "very emotional" at the meeting (Tr. 48), read aloud a six-page handwritten statement she had prepared (DX III) and departed. The first paragraph of that statement said:

> Alice Childress claims she is the sole owner of the "Moms" script. I will agree to this only after she pays me $67,250 for my concept, my research, my expenses and input to the script of "Moms."

Childress did not agree to that suggestion.

Roberts testified that following the critically acclaimed Hudson Guild production of the Childress play, she received several telephone calls, perhaps half a dozen, from third parties expressing an interest in the right to produce the play. Roberts held these inquirers off because she was still in communication with Kramer, Taylor's attorney, and remained hopeful that something would come of the negotiations between Childress and Taylor. In following that course, Roberts regarded herself as acting in accordance with Childress's intent that terms be agreed with Taylor if at all possible. Tr. 51–53.

However, these efforts at agreement came to an abrupt end. Roberts testified:

> . . . I never can believe that negotiations and good faith will break down. Just about the time I might have begun to think so, I heard the terrible news about the Astor Place. Tr. 52.

The "terrible news about the Astor Place" refers to the implementation of Taylor's decision to mount a production without Childress. As Judge Newman described the events in his opinion for the court of appeals: "Taylor hired Ben Caldwell to write another play featuring 'Moms' Mabley; Taylor gave Caldwell a copy of the Childress script and advised him of elements that should be changed. The 'Moms' Mabley play that Caldwell wrote was produced at the Astor Place Theatre in August 1987." 945 F.2d at 503. Childress and Roberts learned of the Astor Place production when they read a casting notice for the play in the trade press.

An exchange of correspondence between the parties' representatives then ensued which for present purposes I need not relate. It is sufficient to say that the Caldwell play has been judicially determined to have infringed Childress's copyrighted play.

The infringing play was produced by The Moms Company of which Taylor was sole

general partner. Defendant Paul Berkowsky, an established figure in theatrical management, was the general manager for the production.

The Moms Company performed the infringing play at the Astor Place Theatre during the weeks ending August 9, 1987 through December 13, 1987, and on a road tour of four cities (Washington, Atlanta, Cleveland and Philadelphia) during May and June, 1988. In addition, The Moms Company presented the infringing play at the Walnut Street Theatre in Philadelphia for the period August 9 through August 21, 1988. Taylor enacted the role of Moms Mabley in all these productions.

The parties have stipulated that the Astor Place production of the infringing play grossed $466,250 at the box office. They further stipulated that the total gross during the road trip and the return to Philadelphia in August 1988 was $350,085.

It is equally undisputed that The Moms Company lost money on these productions. From the gross box office receipts of a play, the producer must pay the salaries of the actors and other members of the company, rent to the theatre owners, and other expenses. The Moms Company incurred combined financial losses from the various productions in an amount in excess of $180,000. ·

In addition to her salary as an actress in the productions, Taylor received $1,597 as a 1% royalty for services rendered as producer and $4,390 as a 2% royalty for services rendered as an author. Caldwell received an advance against author royalties of $2,500 and additional author royalties of $6,987. These amounts are also undisputed.

Flora Roberts, who qualified as an expert witness in respect of "business arrangements between playwrights and producers and other persons and entities which exploit plays on and off Broadway and throughout the country," Tr. 7, gave opinion testimony in support of Childress's claim for actual damages. Roberts testified that the defendants' infringing production at the Astor Place Theatre "destroyed" the value of the Childress play

about Mabley "for a long time to come." Producers would not be inclined "to read another play with the same name as a play that's already on at the Astor Place, regardless of who wrote it." Tr. 15. During cross-examination Roberts gave that chilling effect as the reason why no efforts were made to interest producers in the Childress play after the infringing Astor Place production closed. Roberts estimated that "about five years" would have to pass before the Childress play could be marketed, given the effect of the production of the infringing play. Tr. 53–54. Rather than proceed in that fashion, Childress determined to clear up any uncertainties by bringing this action for copyright infringement.

Roberts testified that if the Childress play about "Moms" Mabley had been produced, it would have fared better than the Caldwell play. She testified:

... my opinion is that Ms. Childress's play would have made a good deal more. It was a better play, it would have had her name on it, she has a following in both the theatre and the book world. And it would have run longer and sold more tickets. Tr. 16.

Given that testimony, plaintiff adopts the gross box office receipts achieved by the Caldwell play as a "conservative" basis for determining actual damages for the infringement. Roberts testified that in negotiations with a producer for the Childress play, she would have negotiated and obtained an author's royalty of 6% of the gross box office receipts. Applying that royalty percentage to the gross receipts realized by the infringing productions, Childress calculates her claim as follows: the Astor Place Theatre production grossed $466,250; 6% of that gross is $27,975. Deducting the $2,500 advance Childress received from Taylor, "the total minimum amount that Ms. Childress would have received from granting the Off–Broadway rights to her play thus is $25,475." Plaintiff's post-trial brief at 38. The road productions of the infringing play, including the two productions at Philadelphia, result-

ed in gross receipts of $350,485, of which 6% is $21,005.

Lastly, Roberts testified that but for the infringing play, she could have sold United States stock company and amateur rights to organizations which deal in such properties for $25,000, that amount representing a non-refundable advance to Childress against future royalties. Tr. 18.

Accordingly Childress claims $71,480 in actual damages under the Copyright Act. She also claims as "profits" under that statute the royalty payments made to Taylor and Berkowsky.

With respect to an author's royalties, the testimony elicited from plaintiff's expert, Roberts, makes it clear that authors frequently agree to waive or defer royalties during weeks when the play is losing money for the producer. Roberts testified on cross-examination:

Q. Now, in terms of waiving royalties on loss weeks, on deficit weeks, has Ms. Childress waived royalties in deficit weeks from time to time, in some of her contacts?
A. I'm laughing because my office says I can't use the word, but it's called the Flora Roberts blank principle, no writer's words are ever used for nothing. So when they ask for total waivers, what I do is, I ask for a minimal amount, and then I make it a deferment out of future profit-making weeks or when the show is in profits.
Q. I see. So you will consent to waivers?
A. To partial waivers on deferment.
Q. But on the proposition that when the show does make money, then, of course, they will make up the—
A. That's right.
Q. —the amounts that they waived?
A. That's right.
Q. But those amounts sometimes don't get made up when the show doesn't make any money?
A. That's right, that's exactly right. Tr. 36–37.

As alternative damages, Childress claims $50,000 in statutory damages under the Copyright Act, or $71,480 under her Lanham Act and New York State general business law claims, also asserted in the complaint and on which plaintiff also received summary judgment against these defendants. See November 27, 1990 opinion at slip op. 19–20.

Lastly, plaintiff claims $100,000 in punitive damages on her state law claim.

## Discussion

### Damages Under the Copyright Act

██ In general, a copyright owner is entitled to recover the actual damages he suffered and any profits made by the infringer attributable to the infringement and not taken into account in computing actual damages. 17 U.S.C. § 504(b). At any time before final judgment, the owner may elect to recover, instead of actual damages and profits, statutory damages for those works whose copyrights were registered at the time the infringement occurred. § 504(c)(1) See, e.g., Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., Inc., 807 F.2d 1110, 1114 (2d Cir.1986). The 1976 Copyright Act departed from the previous copyright statute, under which a copyright holder could receive a cumulative award of his own damages, including profits the owner would have earned on lost sales, and the infringer's actual profits, regardless of the latter's relationship to the holder's damages. The 1976 Act reflects the view of Congress that where the defendant's profits are nothing more than a measure of the damages suffered by the copyright owner, it would be inappropriate to award damages and profits cumulatively, since in effect they amount to the same thing. The result is different where the copyright owner has suffered damages not reflected in the infringer's profits, or where there have been profits attributable to the copyrighted work but not used as a measure of damages. In those circumstances, § 504(b) authorizes the award of both. See Abeshouse v. Ultragraphics, Inc., 754 F.2d 467, 470 (2d Cir.1985) (citing and quoting legislative history).

In the case at bar, Childress claims actual damages in the amount of $71,480, to-

gether with profits in the form of royalties received by Taylor as producer and author of the infringing play, and by Caldwell as author.

In the alternative, and in the event that those damages are held to be unrecoverable in fact or in law, plaintiff elects to recover statutory damages. She claims the maximum statutory amount of $50,000. § 504(c)(1), as it existed at the time of the infringing conduct, allows the copyright owner to elect "at any time before final judgment is rendered" to recover "instead of actual damages and profits" statutory damages "in a sum of not less than $250 or more than $10,000 as the court considers just" with respect to any one work. § 504(c)(2) permits statutory damages to be increased to "a sum of not more than $50,-000" where the copyright owner "sustains the burden of proving, and the court finds, that infringement was committed willfully." That subsection also provides that when the infringer "sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright," the court may reduce the award of statutory damages to a sum of not less than $100. The Berne Convention raised these various amounts, but the United States did not adhere to the Convention until March 1, 1989, after the infringing acts at bar had occurred.[2]

I consider actual damages and statutory damages in turn.

### (1) Actual Damages

The case for plaintiff is that "defendants' infringing conduct deprived Ms. Childress of at least $25,475 in author's royalties with respect to an Off–Broadway production of her play; at least $21,005 in royalties from a tour production; and approximately $25,000 in a stock and amateur advance for a total of $71,480." Plaintiff's post-trial brief at 33. As noted, the first two components of that total result from

application of a 6% author's royalty to the gross box receipts realized by the infringing productions.

Defendants characterize plaintiff's claim as based on the "reasonable royalty" theory, which they argue the Second Circuit held inapplicable to copyright actions in *Business Trends Analysts, Inc. v. Fredonia Group, Inc.*, 887 F.2d 399, 405 (2d Cir.1989).

Unlike the case at bar, *Business Trends* involved a late-registering plaintiff for whom statutory damages were not available. It was a case of actual damages or nothing. *See* 887 F.2d at 403–04. The defendant in *Business Trends* infringed plaintiff's robotic studies. Originally defendant priced its infringing study at $1,500, the same price plaintiff charged for its study. However, defendant achieved only negligible sales. It thereupon offered the infringing study, together with two other studies, for only $150 each during a limited special offer intended to expand defendant's customer base. Defendant sold 37 of its robotics studies at or near the discount price. Its president testified at trial that the discount "was calculated to, *and did*, bring a discrete, concrete market advantage which [he] valued at the calculated cost of the differential between the regular copy price ($1500) and the sales copy price ($150)." I have quoted the district court opinion, 700 F.Supp. 1213, 1238 (S.D.N.Y.1988) (Conboy, J.) (emphasis in original).

In these circumstances, Judge Conboy awarded plaintiff defendant's actual profits on the sale of the robotics studies: gross profits of $9,745.00 less proven expenses of $5,666.65. In addition, he awarded plaintiff damages for "market advantage" or "value of use" in the amount of $1,500, the full list price, less $150 for each copy sold. That differential, $1,350, the district court multiplied by 37, the number of copies sold at the discount price, which resulted in "a

---

**2.** The Berne Convention Implementation Act of 1988, Pub.L. 100–568, Oct. 31, 1988, 102 Stat. 2853, which was enacted pursuant to the Convention for the Protection of Literary and Artistic Works, signed at Berne, Switzerland on September 9, 1986, and all acts, protocols, and revisions thereto, became effective on March 1, 1989, when the Convention entered into force for the United States. See Treaty Document 99–27.

damages figure of $49,950 in market advantage or value of use." 887 F.2d at 402. On appeal, the Second Circuit affirmed the award of defendant's profits but reversed the award based upon market advantage or value of use.

The Second Circuit perceived the district court's value of use award as having been based upon two alternative theories. The first theory involved the district court's finding that defendant "received profits in the form of a market advantage or value of use from the good will established by using the discounted robotics study as a means of familiarizing potential customers with [defendant's] products." *Id.* at 404. The court of appeals saw "no legal barrier" to characterizing enhanced goodwill and market recognition as a "profit" under § 504(b), but concluded that the evidence did not support the award, in part because any gain in market recognition "cannot be attributed to the robotics study alone because other noninfringing studies were discounted as part of the same market strategy." *Id.*

The Second Circuit characterized the district court's alternative theory as derived from the Seventh Circuit's decision in *Deltak, Inc. v. Advanced Systems, Inc.*, 767 F.2d 357 (7th Cir.1985), which Judge Conboy cited and relied upon, 700 F.Supp. at 1238, although the parties in *Business Trends* had not argued the case to him, *see* 887 F.2d at 405 n. 2. In *Deltak*, which also involved a late-registering copyright owner, plaintiff sold kits teaching data processing skills which included a description of data-processing tasks cross-referenced to plaintiff's publications. Defendant, a competitor, copied plaintiff's descriptions of the tasks but substituted its own publications. The infringer failed in his effort to attract plaintiff's customers. In the event, plaintiff lost no prospective sales and defendant realized no profits. In Judge Winter's words in *Business Trends:* "Faced with the seemingly inequitable prospect of awarding no damages, the Seventh Circuit determined that an award for the value of use of the infringing studies was appropriate. By copying the Deltak pamphlet, the court held, ASI had saved itself the cost of

purchasing the Deltak kit." 887 F.2d at 405. The Seventh Circuit remanded the case to the district for a finding of a fair market value of the Deltak kit. Judge Winter continued in *Business Trends:*

> In the court's view, ASI had saved itself "what a willing buyer would have been reasonably required to pay to a willing seller for [the infringed party's] work." *Deltak,* 767 F.2d at 362 (quoting *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1174 (9th Cir.1977). Although the court declined to award the full $5,000 list price of Deltak's kit as a measure of the value of use because actual sales of the kit appeared to have been at much lower prices, it remanded to the district court for a finding of the fair market value of the Deltak kit.
>
> Applying *Deltak* to the instant case, TFG might be said to profited from the value of use in the amount of the saved acquisition cost of the Predicasts study. This could be calculated as the number of discounted sales multiplied by $1,350 (the sales price of the Predicasts study less $150 in TFG's gross receipts already reflected in the award for actual profits). *Deltak* thus provided an alternative ground for the award by Judge Conboy. *Id.* (footnote omitted).

The Second Circuit rejected the *Deltak* approach as "speculative and artificial," *id.* at 405, while emphasizing again that "we are not rejecting as a matter of law a view of 'profits' under Section 504(b) that might include enhanced goods will or market recognition. We hold only that the proof in the instant case is inadequate to support such an award." *Id.* at 407.

In the case at bar, Childress's claim may fairly be termed as one for a "reasonable royalty," a standard of actual damages which "looks to the royalties customarily paid for the type of use to which the defendant has put the infringing material" 3 *Nimmer On Copyright* (1992) at § 14.-02[A], 14–17. Nimmer also observes that "the similarities between this reason royalty rule and *Deltak's* value of use theory are apparent." *Id.* However Professor

Goldstein discusses "reasonable royalty" and "market value" under separate headings, citing *Deltak* as an example of the latter measure of damages, and defending the reasonable royalty standard as not inconsistent with the 1976 Act's provision for statutory damages, at least in cases "where the copyright owner and the infringer occupy different markets, so that the lost sales measure cannot effectively be applied . . ." II Goldstein, *Copyright,* (1989) at § 12.1.1(b) at 316–18.

I find it unnecessary to decide whether *Business Trends* precludes as a matter of law Childress's claim for lost royalties, based upon the gross box office receipts of the infringing productions, because in any event the evidence fails to sustain the claim.

 An award under § 504(b) cannot be based "upon undue speculation," *Abeshouse, supra,* at 470. Undue speculation may result from unfounded assumptions. *See Stevens Linen Associates, Inc. v. Mastercraft Corp.,* 656 F.2d 11, 14–15 (2d Cir. 1981) ("The district court was correct in refusing to grant to Stevens damages based upon the assumption that it would have sold the entire amount of fabric sold by Mastercraft.")

 In the case at bar, the assumption that The Moms Company, controlled by Taylor, would have paid Childress a 6% author's royalty on its productions of a play about "Moms" Mabley flies in the face of all the evidence. The history of the failed negotiations between Childress and Taylor undermines the assumption upon which Childress calculates actual damages. Taylor stubbornly clung to the idea that she partially owned the Childress script. The testimony of Flora Roberts makes clear that a 6% author's royalty represents the higher end of the royalty scale for an established author whose propriety interest in the play is not challenged in any way by the producer, as Taylor most certainly challenged Childress. There is, in short, no basis to assume that Taylor, the general partner of The Moms Company, would ever have agreed in principle to a 6% author's royalty to Childress.

But even if one assumes a willingness on Taylor's part to agree in principle to a 6% author's royalty, it is highly unlikely that such royalty would have been paid to Childress in practice. The "Moms" play failed commercially. The Hudson Guild production, in a very small theatre, must on the strength of the critics' reviews be counted a *succes d'estime;* but the Astor Place and road tour productions all lost money. The testimony of Flora Roberts makes it clear that authors typically defer a significant amount of their royalties until the play shows a profit for the producer; and, if the show never makes money, the waived or deferred royalties are never paid. The briefs of counsel interpret Roberts's testimony on the point differently. It seems to me clear enough. Asked on cross examination about the waiver of royalties on deficit weeks, Ms. Roberts laughingly referred to her governing principle that "no writer's words are ever used for nothing," and then added: "So when they ask for total waivers, what I do is, I ask for a minimal amount, and then I make it a deferment out of future profit-making weeks or when the show is in profits." I take this to mean that Roberts insists upon payment of a "minimal" royalty for her author-client, thereby preserving the rule that a writer's words are never used for nothing, but defers the balance: a balance that is never realized if (as with the "Moms" play) the production never turns a profit. The evidence does not further define that "minimal" royalty; but by definition it is less than the contracted for amount, and "minimal" means "very little."

Roberts expressed the opinion that had the Childress play been produced at the Astor Theatre, it "would have made a good deal more. It was a better, play, it would have had her name on it, she has a following in both the theatre and the book world and it would have run longer and sold more tickets." From that opinion Roberts reasoned that a more successful tour could have been arranged, and that Roberts could have negotiated on Childress's behalf a contract with a licensing agency such as Samuel French, Inc. Roberts had placed

earlier Childress plays with Samuel French. She testified that she would have obtained about $25,000 as a non-refundable advance against future stock and amateur production income for Childress's "Moms" play. Tr. 17–18. Childress adds that $25,000 amount to her claim for actual damages.

Several assumptions underlie this reasoning. The only way lost royalties can be made the basis of an actual damages award is to assume that Childress would have found a different producer for her "Moms" play at the Astor Theatre (or other off-Broadway house), starring a different actress in the title role (Taylor would never have agreed), and that the production would have been a commercial success, thereby generating the 6% author's royalty. These assumptions are far too tenuous to support an award of damages. It is at least doubtful that another actress would have been as effective in the role of "Moms" Mabley as Taylor, given that actress's abiding interest in the character and the strength of her performance, as reflected by the reviews and her "Obie" award. Nor can it be said that the Caldwell play was so inferior to the Childress play that the former's commercial failure is not probative of the latter's prospects. As plaintiff has insisted throughout, the Caldwell play infringed the Childress play precisely because they are so similar; and it is no more than speculation to say that Childress's name as author would have turned a money-losing play about "Moms" Mabley into a money-maker. "The play's the thing," as an earlier playwright wrote; and the Astor Place production had the benefit of the very favorable reviews generated by the Hudson Guild production of the Childress play, which the defendants simply appropriated in advertising their own production. Notwithstanding the invocation of those favorable reviews, generated by a production at a very small theatre, the "Moms" play never made money at larger commercial theatres.

The only inference the evidence supports is that, for all the fascination "Moms" Mabley held for Taylor, a play based upon "Moms" was not a commercially successful property.

Accordingly I reject, as unsupported by the evidence, Childress's claim for actual damages based upon a 6% royalty of the gross box office sales realized by the infringing productions.

■ For essentially the same reasons, I reject the claim for $25,000 based upon the assumed contract with Samuel French, Inc. for stock and amateur rights. Furthermore, the past contracts and royalty reports involving Childress plays in the hands of French, which were received in evidence, cast grave doubt about upon that $25,000 claim. The only Childress work to generate more than nominal royalties from stock and amateur productions was the play "Wedding Band," which concerned an interracial relationship, was produced by the New York Shakespeare Festival in 1972 starring a renowned actress, Ruby Dee, and was then made into a television movie broadcast on network television starring the well known Cicely Tyson and Paul Winfield. The openings of "Wedding Band" in Atlanta, Georgia and Charleston and Columbia, South Carolina, were attended by considerable local ceremony. Childress has received about $18,000 in royalties from the exploitation of "Wedding Band" by Samuel French, Inc. in the stock and amateur production markets. It is the only Childress play to have produced such royalties in an amount of any significance. Given all the circumstances, I find myself unable to accept the assumption that Samuel French, Inc. would have paid $25,000 as a non-refundable advance against stock and amateur royalties for the "Moms" play.[3]

The remaining issue on actual damages is whether the royalties received by Taylor as author and producer of the infringing play, and by Caldwell as its author, consti-

---

3. I accept Flora Robert's expertise on these issues, and recognize that defendants called no expert witness of their own. But trial judges traditionally instruct jurors that expert opinion testimony is only advisory, and may be rejected if based upon assumptions other evidence calls into question. As fact finder in this case, I act on that instruction.

tute "profits" under the Copyright Act, and are accordingly recoverable by plaintiff.

Since the statute does not define the term "profit," the word "must be assumed to have its ordinary or usual meaning." *MCA, Inc. v. Wilson*, 677 F.2d 180, 186 (2nd Cir.1981). The court of appeals then referred to dictionary definitions of profit as "entrepreneurial or employer income as distinguished from wages or rent," and "gain realized from business or investment over and above expenditures" and "in distinction from the wages of labor." Applying those definitions, the court held that the salary paid to the president of the theatre where the infringing work was performed did not constitute "profit" from infringement. The Second Circuit said of the theatre owner:

> Although he was in charge of the premises, he had nothing to do with Let My People Come [the infringing work]. He was paid an annual salary of $25,000.00. There was no proof that this salary was contingent upon or fixed by the profits of Let My People Come. *Id.*

In contrast, an author's royalties, based on a percentage of the revenues generated by a production, are inherently "contingent upon or fixed by" the profits of the infringing work. The Ninth Circuit drew the distinction between salary and royalties in *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505, 519 (9th Cir. 1985):

> Arden may be liable for profits he earned in connection with the production of *Hallelujah Hollywood,* but amounts paid to him as salary are not to be considered as profits. *See MCA, Inc, v. Wilson*, 677 F.2d at 186. But if Arden did earn profits from the production, such as royalties, he is liable for a proportionate amount of these. Concomitantly, defendant MGM Grand would be entitled to deduct any such royalties as costs in arriving at its own profits. *See Smith v. Little Brown & Co.*, 396 F.2d 150, 151–152 (2d Cir.1968), *see Cream Records, Inc., v. Jos Schlitz Brewing Co.*, 754 F.2d [826] at 829 [ (9th Cir.1985) ] (interpreting the 1976 Act).

The royalties paid to Taylor and Caldwell constitute recoverable infringers' profits.

#### (2) Statutory Damages

The parties approach statutory damages from the predictable opposite poles. Childress contends that she has proved defendants committed their infringement willfully, and asks statutory damages in the maximum amount of $50,000. Defendants contend that they have proved their infringement was innocent, and contend for statutory damages in the minimum amount of $100.

A threshold issue arises out of Taylor's reliance upon a statement by the Court in the November 27, 1990 opinion granting Childress summary judgment on liability. At slip op. 9–10, after reviewing pertinent legal principles, I said:

> Judged by these standards, Taylor cannot be characterized as a co-author of the Play. I accept that Taylor had that perception of herself, and further that she entertained it in good faith. Her feelings and intent are understandable in human terms, since she had long been interested in Moms Mabley, and suggested the idea of a play about Mabley to Childress. But a subjective state of mind cannot of itself satisfy the objective criteria of the copyright law, particularly where the state of mind was emphatically not shared by the purported co-author.

In the present context, Taylor relies upon the second and third sentences of that passage as a judicial declaration of her good faith and consequent innocence.

The contention comes close to invoking the law of the case doctrine, although Taylor's briefs do not employ that particular phrase. Law of the case is not a commandment etched in stone. "It is well established that the interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment, and may be modified to the same extent if the case is reassigned to another judge." *In re United States*, 733 F.2d 10, 13 (2d Cir.1984). "[T]here is no imperative duty to follow the earlier ruling—only the desirability that suitors shall, so far as

possible, have reliable guidance how to conduct their affairs." *Dictograph Products Co. v. Sonotone Corp.*, 230 F.2d 131, 135 (2d Cir.1956) (L. Hand, J.). Prior rulings may be re-considered in the light of now prevailing legal standards and a more complete factual record developed during discovery. *See Group Health Inc. v. Blue Cross Association*, 739 F.Supp. 921, 929–30 (S.D.N.Y.1990).

In the case at bar, Taylor's state of mind and motivation are more fully revealed by full plenary trial, including the testimony of participants in the unsuccessful contract negotiations between the Childress and Taylor camps.

■ Furthermore, even if one accepts Taylor's subjective good faith belief that she was a co-author of the Childress play, that does not establish her innocence under § 504(c)(2) and a consequent entitlement to minimum statutory damages liability. "[A] defendant is entitled to such reduced minimum only if he proves not only that his infringing conduct was made in a good faith belief of the innocence of his conduct, but also that he was reasonable in holding such good faith belief." 3 *Nimmer on Copyright* (1992) § 14.04[b][2] at 14–47. "[T]o be entitled to the lowered floor for recovery, the infringer must sustain the burden of proving not only that it was unaware that its acts constituted copyright infringement but also that it had no reason to believe that they constituted infringement." II Goldstein, *Copyright* (1989) at § 12.2.1(b) at 341.

Thus an infringer must meet a two-pronged burden of proof to establish innocence: (1) a subjective good faith belief in that state of grace which was (2) objectively reasonable under the circumstances. The latter element requires consideration of an argument made by all defendants: "Defendant Taylor believed, and defendants Berkowsky and Caldwell accepted Taylor's representation, that Taylor owned the "Moms" project by virtue of Taylor having commissioned the Childress play, and that, in any event, Taylor's creative contributions rendered her a co-author of that joint work." Post trial brief at 10.

Defendants seek to reinforce the argument by observing that "not until the appellate decision affirming the opinion of this Court was it the role [sic] of law in this Circuit that each author's contribution to a 'joint work' need be independently copyrightable." *Id.* at 9.

■ It is true that Judge Newman's opinion for the Second Circuit dealt at 945 F.2d at 506–509 with the "substantial issue arising under the statutory definition of 'joint work'" of "whether the contribution of each joint author must be copyrightable or only the combined result of their joint efforts must be copyrightable." He went on to say: "The issue, apparently open in this Circuit, is troublesome." *Id.* at 506. The Second Circuit concluded in *Childress v. Taylor* that it was "more consistent with the spirit of copyright law to oblige all joint authors to make copyrightable contributions, leaving those with non-copyrightable contributions to protect their rights through contract." *Id.* at 507.

■ The court of appeals' resolution of this issue might be relevant to the defendant infringers' willfulness or innocence if there was any evidence that they relied upon the proposition which the Second Circuit ultimately rejected. Erroneous advice of an attorney may negate willfulness. *See Turnpike Tom v. Kings Court, Inc.*, 1 U.S.P.Q.2d 1227 (E.D.Va.1986) (small tavern owner, relying on the advice of his attorney that he did not need a license, held not to have acted recklessly in disregard of plaintiff's copyrights, nor did he have uncontroverted knowledge that he violated federal law.) While Taylor was represented by counsel at the pertinent times, she never testified that she relied upon his advice that her contributions to the "joint work" need not be independently copyrightable, thereby justifying her appropriation of the Childress script. Nor was counsel representing Taylor at the time called at trial to testify that he gave Taylor such advice. Testimony describing Taylor's perception of and reliance upon the then-existing state of copyright law would have been admissible on the issue of her state of mind, although it would constitute a waiver

of the attorney-client privilege. *See United States v. Bilzerian,* 926 F.2d 1285, 1291–94 (2d Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991).

In point of fact, defendants offered no evidence of Taylor's reliance on such advice of counsel. As far as counsel's views are concerned, the record evidence points the other way. It was a draft agreement prepared by Taylor's counsel which recited that: "The Producer [Taylor] wishes to acquire from the Author [Childress] the rights to produce and present a dramatic play written by Author and heretofore presented at the Hudson Guild Theatre based on the life and career of Moms Mabley ..." Those words fly in the face of any post-trial assertion that when the pertinent events were unfolding, Taylor believed or had been advised that her non-copyrightable contributions transformed the Childress play into a "joint work" which Taylor was free to exploit, under the rubric of "joint work" or otherwise.

Moreover, any contention that defendants foundered and sank upon the previously uncharted reef of Judge Newman's opinion is undermined by the fact that the Second Circuit did not decide the case on that point. The court of appeals affirmed grant of summary judgment to Childress not on the basis that the statutory definition of "joint work" requires the contribution of each joint author to be copyrightable, but rather upon the wholly separate ground that 17 U.S.C. § 101 requires that a joint work be prepared "with the intention [by two or more authors] that their contributions be merged into inseparable or interdependent parts of a unitary whole." Having concluded that each contribution must be independently copyrightable, Judge Newman's opinion went on to say at 507: "There remains for consideration the crucial aspect of joint authorship—the nature of the intent that must be entertained by each putative joint author at the time the contribution of each was created." The Second Circuit affirmed summary judgment in Childress's favor because it agreed with this Court that the mutual state of mind required for joint authorship did not exist. The centrality of the issue is apparent from the Second Circuit's opinion at 509:

> We need not determine whether we agree with [the district court's] conclusion that Taylor's contributions were not independently copyrightable since, even if they were protectable as expression or as an original selection of facts, we agree that there is no evidence from which a trier could infer that Childress had the state of mind required for joint authorship. As Judge Haight observed, whatever thought of co-authorship might have existed in Taylor's mind "was emphatically not shared by the purported co-author." There is no evidence that Childress ever contemplated, much less would have accepted, crediting the play as "written by Alice Childress and Clarice Taylor."

The most that can be said for Taylor was that she had a subjective good faith belief that her contributions entitled her to be regarded as a co-author of the Childress play. The second prong of innocent infringer analysis would require me to find that it was objectively reasonable for Taylor to conclude that her contributions created a "joint work," so that Childress could not claim infringement. Given the unsettled state of the law prior to the Second Circuit's opinion in this case, that is perhaps an arguable proposition. But it all comes to nothing because Taylor cannot satisfy even the subjective prong of the issue on which the case was decided. She could not in good faith have believed that Childress intended the play to be regarded as one of joint authorship. Childress never wavered from her adamant insistence that she was the sole author.

 None of the three defendants has sustained the burden of establishing innocent infringement. It requires no further discussion to demonstrate why that is so of Taylor, who appropriated the Childress play for her own purposes. Nor can Caldwell be regarded as an innocent infringer: he, together with Taylor, created the infringing play by making only minimal changes in the copyrighted work. As for

Berkowsky, the general manager for the infringing production, he had seen the Hudson Guild production of the Childress play; knew of the similarities between the two scripts in respect of subject matter, content, and settings; and was careful to include in his contract with The Moms Company a provision indemnifying him "from and against any and all charges, expenses, claims, liabilities and risks that you may incur because of the demands or claims made against you by reason of the production and presentation of the play by us." DX GG at ¶ 14. Innocent infringement is not made of such stuff as this.

Accordingly the question is whether plaintiff has proved the defendants committed the infringement "willfully," a word the statute does not define. In *Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., supra,* the Second Circuit held that "a defendant's knowledge that its actions constitute an infringement establishes that the defendant acted willfully within the meaning of § 504(c)(2) for purposes of enhancing statutory damages." Having referred to the congressional provision "for a reduction in the minimum level of statutory damages should the defendant establish that it neither knew, nor had reason to know, that its conduct represented an infringement," the Second Circuit went on to say in *Fitzgerald:*

It is plain that "willfully" infringing and "innocent intent" are not the converse of one another. Thus, it is possible in the same action for a plaintiff not to be able to prove a defendant's willfulness, and, at the same time, for the defendant to be unable to show that it acted innocently. But in indicating what conduct will reduce the penalty, the statutory language also suggests what conduct should increase the penalty. Thus, just as the

lack of actual or constructive knowledge will establish an innocent intent, so a defendant's actual or constructive knowledge proves willfulness.

807 F.2d at 1115.

■ In the case at bar, I find that Taylor and Caldwell had actual knowledge that the Caldwell play infringed the Childress play; and Berkowsky had at least constructive knowledge. Active knowledge of infringement is inherent in the conduct of Taylor and Caldwell, previously described, and is fully (if perhaps unintentionally) revealed by a letter Taylor's attorney Kramer sent to Roberts on June 3, 1987, in response to Roberts's inquiry concerning Taylor's intentions. Kramer wrote in part:

Ben Caldwell has written the play which I will furnish to you when a final draft is available. We have tried in every way to distinguish the new version of the play from what was presented at the Hudson Guild, both by way of content and billing. PX 5(b).

Childress and her agent were never furnished with the "final draft" of the Caldwell play. The effort promised by Kramer to "distinguish" a "new [and hence non-infringing] version of the play from what was presented at the Hudson Guild" came to nothing; the Caldwell play is an obvious infringement. Taylor and Caldwell accordingly had actual knowledge of the infringement. Berkowsky's constructive knowledge of the infringement arises from the totality of the circumstances, previously discussed.[4]

■ It follows that the award of statutory damages must be at least $250 under § 504(c)(1) and may not exceed $50,000 under § 504(c)(2). The Second Circuit's opinion in *Fitzgerald* is one of many recogniz-

---

**4.** At the conclusion of the trial, counsel for defendants made on behalf of Berkowsky an oral application, purportedly pursuant to Rule 60(b), Fed.R.Civ.P., for relief from this Court's prior opinion and order finding Berkowsky liable as a contributory infringer of plaintiff's copyright. That opinion and order preceded the appeal which defendants took on other issues from this Court's grant of summary judgment in plaintiff's favor. Rule 60(b) is not available to afford relief which could have been but was not

pursued on direct appeal. *See Ackermann v. United States,* 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950); *Cruickshank & Co., Ltd. v. Dutchess Shipping Co.,* 805 F.2d 465, 468 (2d Cir.1986); *Matarese v. LeFevre,* 801 F.2d 98, 107 (2d Cir.1986); *Eutectic Corp. Metco, Inc.,* 597 F.2d 32, 34 (2d Cir.1979); *Rinieri v. News Syndicate Co.,* 385 F.2d 818, 822 (2d Cir.1967). I deny Berkowsky's motion on that procedural ground. Alternatively, in the circumstances of the case it lacks merit.

ing "the wide discretion the Copyright Act affords the trial court in setting the amount of statutory damages." 807 F.2d at 1116. As this Court has held, "the amount of statutory damages should bear some relation to the circumstances of the infringement." *Warner Bros. v. Dae Rim Trading, Inc.,* 677 F.Supp. 740, 769 (S.D.N.Y.1988), *aff'd in part and rev'd in part,* 877 F.2d 1120 (2d Cir.1989); *see Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F.Supp. 1522, 1543–44 (S.D.N.Y.1991).

■ In the case at bar, I decline to fix statutory damages in the maximum amount of $50,000. Taylor is the principal engine of the infringement. While I have found that she committed her infringement "willfully" under the statute, her conduct is mitigated at least in part by the circumstances of her initial payment to Childress, the extent of Taylor's contributions to the project, the fact that the project has caused Taylor to lose considerable sums, and there is no need to impose the maximum amount to deter future conduct. In the exercise of my discretion I assess statutory damages in the amount of $30,000.

It remains to decide how that award should be apportioned among the defendants. Generally, the liability for statutory damage among several infringers is joint and several, and the statute "does not distinguish between those who maliciously infringe another's copyright or those who simply act knowing they are infringing upon the copyright." *Fitzgerald* at 1117. The Second Circuit also held in *Fitzgerald* that awards of statutory damages serve two purposes, compensatory and punitive; that to the extent the award compensates the plaintiff for injury "the relative faults of the defendant are irrelevant"; but "[a]s to that part of the award that is punitive in nature, the less culpable defendant will have a recovery over against the more culpable defendant in most instances." *Id.* This question has not been briefed by the parties. They are directed to do so upon

settlement of the judgment. I defer decision on the point until then.

Lanham Act and New York State General Business Law Claims

These are alternative claims for actual damages. I reject those claims for the reasons stated in rejecting comparable claims under the Copyright Act, except that plaintiff is entitled to recover the royalties received by Taylor and Caldwell.

Punitive Damages

In addition to the maximum statutory award of $50,000 under the Copyright Act for willful infringement, plaintiff also demands $100,000 in punitive damages on her state law claim for unfair competition.[5] I reject that claim.

■ As a general proposition, punitive damages are available under New York law for a claim of unfair competition. *See Getty Petroleum Corp. v. Island Transportation Corp.,* 878 F.2d 650, 657 (2d Cir.1989). Such damages are available under New York law where a "defendant's conduct has constituted 'gross, wanton or willful fraud or other morally culpable conduct' to an extreme degree." *Smith v. Lightening Bolt Productions, Inc.,* 861 F.2d 363, 371 (2d Cir.1988) (quoting *Borkowski v. Borkowski,* 39 N.Y.2d 982, 983, 387 N.Y.S.2d 233, 355 N.E.2d 287 (1976). The Second Circuit has also held that New York law permits punitive damages "where a wrong is aggravated by recklessness or willfulness, ... whether or not directed against the public generally...." *Roy Export Co. v. CBS, Inc.,* 672 F.2d 1095, 1106 (2d Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).

■ However, punitive damages are discretionary with the factfinder, not mandatory. In the case at bar, I think that the $30,000 statutory damages award under the Copyright act is sufficient. Given plaintiff's failure to prove actual damages, the $30,000 statutory award must be regarded as primarily punitive in nature. Accordingly the New York public policy un-

5. Punitive damages are not recoverable under the Lanham Act. *See Getty Petroleum Corp. v. Bartco Petroleum Corp.,* 858 F.2d 103, 113 (2d Cir.1988). I assume without deciding that they may be recovered in addition to statutory damages under the Copyright Act.

derlying punitive damages has been satisfied.

Counsel for plaintiff are directed to settle a Judgment consistent with this Opinion on seven (7) days' notice within fourteen (14) days of the date of this Opinion.

The issue of plaintiff's entitlement to attorneys fees, if not capable of settlement, will be resolved following the procedures described in the Court's Memorandum Opinion and Order dated January 2, 1992.

It is SO ORDERED.